# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

CORNELIUS CAROLINA,

                      Petitioner,

v.

JASON WELLS,

                      Respondent.

Case No. 23-CV-836-JPS

## ORDER

## 1.    INTRODUCTION

In June 2023, Petitioner Cornelius Carolina ("Petitioner") filed a petition to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2254. ECF No. 1. This Court screened the petition under Rule 4 of the Rules Governing § 2254 cases and ordered Petitioner to file an amended petition omitting two unexhausted grounds for relief and one procedurally defaulted ground for relief. ECF No. 4 at 9 ("Should Petitioner wish to continue with this action, he must file an amended § 2254 petition listing only Grounds Two, Five, and Six . . . ."). The Court then screened, ECF No. 6, Petitioner's amended petition, ECF No. 5, which raises only the following three grounds for relief, as instructed:

- Ground Two: "Ineffective assistance of counsel for failure to object to admission of prior bad acts evidence." ECF No. 5 at 6;

- Ground Five: "Inappropriate provision of perjury warning to witnesses adverse to the State on the part of the court, bearing on the credibility of said witnesses." *Id.* at 7;

- Ground Six: "Judicial bias." *Id.* at 8.

Respondent Jason Wells ("Respondent") answered the amended petition in September 2023. ECF No. 10. The amended petition is now fully briefed, ECF Nos. 20, 21, 23, and therefore ripe for a merits analysis. For the reasons discussed herein, the Court will deny the amended § 2254 petition and dismiss this case with prejudice.

2.    **BACKGROUND**

This § 2254 action arises out of Petitioner's conviction in Outagamie County Circuit Court Case No. 2016CF000983.[1] ECF No. 5 at 2. Petitioner was ultimately charged in that case with four total counts—one of robbery of a financial institution, two of false imprisonment, and one of first degree recklessly endangering safety—for allegedly robbing a credit union (the "credit union robbery"). State Court Docket. A jury found Petitioner guilty of the credit union robbery and false imprisonment counts but acquitted him on the first-degree recklessly endangering safety charge. ECF No. 10-6 at 5. The circuit court sentenced him to a total term of 20 years' imprisonment to be followed by 20 years' extended supervision. *Id.*

3.    **STANDARD OF REVIEW ON HABEAS**

State criminal convictions are generally considered final. Review may be had in federal court only on limited grounds. To obtain habeas relief from a state conviction, 28 U.S.C. § 2254(d)(1) (as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA")) requires the petitioner to show that the state court's decision on the merits of his constitutional claim was contrary to, or involved an unreasonable

---

[1] *See State of Wisconsin v. Cornelius Carolina*, No. 2016CF000983 (Outagamie Cnty. Cir. Ct. 2016), available at https://wcca.wicourts.gov/caseDetail.html?caseNo=2016CF000983&countyNo=44&index=0 (last visited May 17, 2024) (cited to hereafter as "State Court Docket").

application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Brown v. Payton*, 544 U.S. 133, 141 (2005). The burden of proof rests with the petitioner. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam)). The relevant decision for this Court to review is that of the last state court to rule on the merits of the petitioner's claim. *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006) (citing *McFowler v. Jaimet*, 349 F.3d 436, 446 (7th Cir. 2003)).

A state-court decision runs contrary to clearly established Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [those] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result." *Brown*, 544 U.S. at 141 (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000) and *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)). Similarly, a state court unreasonably applies clearly established Supreme Court precedent when it applies that precedent to the facts in an objectively unreasonable manner. *Id.*; *Bailey v. Lemke*, 735 F.3d 945, 949 (7th Cir. 2013).

The AEDPA undoubtedly mandates a deferential standard of review. The Supreme Court has "emphasized with rather unexpected vigor" the strict limits imposed by Congress on the authority of federal habeas courts to overturn state criminal convictions. *Price v. Thurmer*, 637 F.3d 831, 839 (7th Cir. 2011) (citing *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011)). It is not enough for the petitioner to prove the state courts were wrong; he must also prove they acted unreasonably. *Harrington*, 562 U.S. at 101; *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014) ("An 'unreasonable application of' federal law means 'objectively unreasonable, not merely

wrong; even "clear error" will not suffice.'" (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014))).

Indeed, the petitioner must demonstrate that the state court decision is "so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013) (quoting *Harrington*, 562 U.S. at 102). The state court decisions must "be given the benefit of the doubt." *Woodford*, 537 U.S. at 24; *Hartjes v. Endicott*, 456 F.3d 786, 792 (7th Cir. 2006). Further, when a state court applies general constitutional standards, it is afforded even more latitude under the AEDPA in reaching decisions based on those standards. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." (citing *Wright v. West*, 505 U.S. 277, 308–09 (1992) (Kennedy, J., concurring))).

As the Supreme Court has explained, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102. Indeed, Section 2254(d) stops just short of "imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id.* (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)). This is so because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).

A federal court may also grant habeas relief on the alternative ground that the state court's adjudication of a constitutional claim was based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). The underlying state court findings of fact and credibility determinations are, however, presumed correct. *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013) (quoting *Taylor v. Grounds*, 721 F.3d 809, 817 (7th Cir. 2013)). The petitioner overcomes that presumption only if he proves by clear and convincing evidence that those findings are wrong. 28 U.S.C. § 2254(e)(1); *Campbell*, 770 F.3d at 546 (quoting Newman, 726 F.3d at 928). "A decision 'involves an unreasonable determination of the facts if it rests upon factfinding that ignores the clear and convincing weight of the evidence.'" *Bailey*, 735 F.3d at 949–50 (quoting *Goudy v. Basinger*, 604 F.3d 394, 399–400 (7th Cir. 2010)). "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt v. Titlow*, 571 U.S. 12, 17 (2013) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

If shown, an unreasonable factual determination by the state court means that this Court must review the claim in question de novo. *Carlson v. Jess*, 526 F.3d 1018, 1023 (7th Cir. 2008). A federal court also reviews a claim de novo where the state courts failed to "reach the merits" of the federal constitutional claim entirely. *Cone v. Bell*, 556 U.S. 449, 472 (2009) ("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim, federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings.' 28 U.S.C. § 2254(d). Instead, the claim is reviewed *de novo*."

(citing *Rompilla v. Beard*, 545 U.S. 374 390 (2005) and *Wiggins v. Smith*, 539 U.S. 510, 534 (2003))).

## 4. LAW & ANALYSIS

### 4.1 Ground Two

In Ground Two, Petitioner asserts that his trial counsel, Attorney Michael Shannon Murphy ("Attorney Murphy"), was unconstitutionally ineffective for failing to object at trial to the admission of prior bad acts evidence. ECF No. 20 at 4. Petitioner argues that the trial court "replayed [his] 2011 case out all over again" and that the State made statements at trial about Petitioner "using marijuana, selling drugs, and being a gang member." *Id.* at 4–5. Petitioner argues that Attorney Murphy "allowed this without speaking up" and failed to object to the State's introduction of information that "had nothing to do with the trial." *Id.*

Petitioner also argues that Attorney Murphy "failed to contact any witnesses" and conceded to "not hav[ing] enough time to prepare for trial." *Id.* Petitioner asserts that Attorney Murphy did not contact Petitioner about his case until less than a month before trial and that they had "no in person contact until trial" itself. *Id.* at 4, 6. Attorney Murphy was so unprepared, Petitioner argues, that he repeatedly called Petitioner by the wrong name at trial. *Id.* at 5.

First, Respondent argues that Petitioner's brief in support of his amended petition "raises a litany of complaints about" Attorney Murphy's performance, but that Petitioner only raised one such complaint to the state courts: "that counsel was ineffective for failing to object to the introduction of other acts evidence that was listed in a PSI [presentence investigation report] in [Petitioner's] other case." ECF No. 21 at 2. Accordingly,

Respondent argues, the Court should not consider the other complaints about Attorney Murphy that Petitioner did not exhaust. *Id.*

The Court agrees. Petitioner exhausted just one aspect of his complaints about Attorney Murphy. ECF No. 10-2 at 2 (appellate brief) ("Trial counsel performed deficiently [by] fail[ing] to properly preserve an objection to the admission of other acts evidence used to cross-examine [Petitioner], which caused prejudice because [Petitioner's] credibility was improperly challenged with that evidence.") and at 4 ("Did trial counsel perform deficiently for failing to properly preserve an objection to admission of impermissible other acts evidence when a former [PSI] for [Petitioner] was used to admit evidence that the defendant previously sold drugs, that he lied to his agent, and that he was involved in a shooting?").

He now raises other complaints about Attorney Murphy's performance—for example, that Attorney Murphy never met with Petitioner in person before trial—but the Court cannot consider those complaints on federal habeas review because they were not fully presented to the state courts. "[T]he failure to alert the state court to a complaint about one aspect of counsel's assistance will lead to a procedural default" on that aspect of the claim. *Stevens v. McBride*, 489 F.3d 883, 893–94 (7th Cir. 2007) ("Merits aside, we find it inappropriate to consider this argument because [the petitioner] never argued to the [state] courts that this was one way in which he intended to prove his ineffective assistance of counsel claim."). Accordingly, the Court cabins its ineffective assistance of counsel analysis to the issue that was exhausted and that the Court recited in its previous orders: Attorney Murphy's alleged failure to object to the introduction at trial of prior bad acts evidence. And for the reasons discussed herein, the Court will deny this ground.

### 4.1.1 Facts Relevant to the Merits of Ground Two

Petitioner took the stand to testify on the third day of trial. ECF No. 10-11 at 4, 29. Petitioner acknowledged that he was, at the time of trial, serving a sentence for a previous conviction for robbing a Hollywood Cinema (the "Cinema case" or "Cinema robbery"). *Id.* at 30–31. He conceded to having participated in that robbery and to having possessed a firearm during it, testified that zip ties were used to tie up a victim in that case (as they were in the credit union robbery), *id.* at 36, 39, and conceded to having zip ties at his home, *id.* at 56; *see also id.* at 14. Petitioner also testified on direct examination that he didn't gamble or hang out with gamblers. *Id.* at 40.

During Petitioner's cross-examination, the State questioned Petitioner at length about the Cinema case. *Id.* at 47–49, 70–73.[2] The State questioned Petitioner about his relationship with John Frost ("Frost"), a co-robber in the Cinema case who had also pleaded to the credit union robbery. *Id.* at 69–70. On cross-examination, Petitioner attempted to distance himself from Frost; he testified that Frost was involved in "gambling, drugs, and . . . everything else" but that Petitioner "d[idn't] take part in that." *Id.* at 69.

The State then sought to impeach Petitioner using a PSI created in the Cinema case. ECF No. 10-6 at 5. Outside of the presence of the jury, the trial court addressed "the conflict that apparently exists between [Petitioner's] testimony today . . . and his statements to the presentence writer which are contained in the presentence report in . . . the [Cinema]

---

[2]The State did so because it believed that aspects of the Cinema case were "relevant to identi[f]y motive and the reasons for other acts in this case." ECF No. 10-9 at 11.

case." ECF No. 10-11 at 75. Attorney Murphy asserted that he had no access to the PSI and objected to the State's intended use of it:

> I have no access to this type of document. This is a confidential document. I haven't seen it. This is the first time I have heard of it. I read it. It's prejudicial. If I had known about it, maybe I wouldn't have had [Petitioner] testify. I don't think it's admissible against [Petitioner] in this proceeding. . . . It's an ambush.

*Id*. at 77–78. In response, the State asserted that it would be "unfair . . . not [to] allow [the State] to impeach." *Id.* at 81. "The defendant decided to take the stand. . . . He gave a statement that is entirely inconsistent with what he told someone back in either 2011 or 2012. I believe that we could impeach for that purpose . . . ." *Id.* Attorney Murphy responded, "We're talking about impeaching a defendant with a prior inconsistent statement. I think I would have to know about the inconsistent statement before I put the defendant on. . . . So I am going to renew my objection, judge." *Id.* at 83–84. Attorney Murphy also supplemented his objection by noting that use of the PSI "could be considered compelled testimony or a compelled statement." *Id.* at 85.

The court noted that Petitioner's testimony was "significantly different" than his statements about the Cinema case to the presentence writer and that Petitioner was clearly either "lying then, . . . lying now, or . . . lying on both occasions." *Id.* at 86. The court concluded that the "statements to the presentence writer [we]re not compelled" such that they could not be used on that basis. *Id.* at 87. Nevertheless, at that juncture, the court concluded that it would disallow the use of the PSI for impeachment, in part as a matter of fairness and in part because the PSI had not been disclosed to Attorney Murphy. *Id.* at 92.

Petitioner accordingly returned to the stand, and cross-examination continued. He again testified that he didn't "hang out with drug addicts and alcoholics and gamblers." *Id.* at 97. "I'm not a drug addict. I made a stupid decision," he testified, "but in the entire time I was on probation [I] never dropped dirty, never drank a beer, never smoked anything or took any pills, medication, any of that." *Id.* at 98.

Then, the following exchange occurred on re-cross:

Q: You just indicated that you live a clean life-style, right?

A: Yes.

Q: You indicated that you weren't associated with drugs, right?

A: True.

Q: Do you remember making a comment to someone in relation to the [Cinema] case back in 2012?

. . .

Q: About the case and about your life among other things?

A: I made a statement to a staff member . . . at Waupun Correctional, and basically I told her what she wanted to hear.

Q: . . . Isn't it true that you told this person that you sold any drug that was available to you and often did so to pay for everyday necessities?

A: That was not for that case.

. . .

A: They did a PSI from the time of my first. From the time I was released in 2005 up until now, no drugs, no alcohol, no, nothing.

Q: . . . You just told us and you told the jury that you are not into that stuff and you haven't?

A: I'm not.

. . .

A:     I haven't been since 2005. . . . Nothing . . . .

. . .

Q:     You also said to this person although you sold drugs you didn't use them yourself so you just sold to make money?

A:     When I was a teenager, yes.

Q:     You also said that you had no problems when you were—when you got out on probation, right?

A:     That was later on.

Q:     Isn't it true that the Department of Corrections tried to revoke your probation because you lied to them?

A:     . . . The allegations and the case was thrown out.

Q:     But you lied, right?

A:     No, I did not. That's why the case was thrown out.

Q:     You said a shooting was random, right? You told someone that a shooting was random and then later admitted that the shooting was not random, right?

A:     What are you—I'm not understanding what you are—

Q:     Do you recall that in 2006 you told someone that you were shot and that the shooting was random?

A:     I was shot.

Q:     And you told this person that it was random, right?

A:     At first I thought it was random. Then I later found out that I was set up.

*Id.* at 103–05. During the above-quoted exchange, Attorney Murphy raised no objections. Later, outside the presence of the jury, the Court clarified for the record that it had ultimately allowed the State to utilize certain statements in the PSI to impeach Petitioner:

[D]uring the sidebar I indicated that based upon [Petitioner's] offered testimony since the last time we talked about the PSI, the fact that [Petitioner] had indicated during his testimony

that he didn't have any problems while he was on probation or supervision, and his comments about drug use that it was appropriate to allow the State to ask questions regarding those two areas, which they ended up doing.

*Id.* at 127.[3] Attorney Murphy made no further objection on the matter on the record, *id.* at 128, although he later testified at a postconviction motion hearing that he had understood the trial court as having interpreted his original objection "as a continuing objection," ECF No. 10-14 at 15, 44, which interpretation the trial court considered "reasonable given the circumstances of the trial," ECF No. 10-15 at 8, and the trial court also recalled that Attorney Murphy "had disagreed during the side-bar but [it] had made [its] ruling." ECF No. 10-14 at 31.

### 4.1.2   Court of Appeals' Disposition

The Wisconsin Court of Appeals rejected Petitioner's claim that Attorney Murphy was constitutionally ineffective regarding the State's use of the PSI. ECF No. 10-6 at 15. The Wisconsin Court of Appeals did not address whether Attorney Murphy's performance was deficient. Instead, it concluded that Petitioner had "not established that the result of the trial would have been different absent the use of his PSI statements" and that "the risk was low that the PSI statements would have an unfairly prejudicial effect on the result of the trial." *Id.*

The evidence at trial included [Petitioner's] own admission that he committed the . . . Cinema robbery, which was similar and involved the same suspects, and [a witness's] testimony that [Frost] admitted that he and [Petitioner] committed both robberies. Given this and other evidence presented, it is not

---

[3]Contrary to Petitioner's assertion, ECF No. 20 at 5, no statements about him allegedly "being a gang member" were made at trial in the presence of the jury.

reasonably probable that the information contained in the PSI alone would have impacted the verdict.

*Id.* at 15–16.

### 4.1.3 Analysis

"The Sixth Amendment protects the 'fundamental right to a fair trial.'" *Carter v. Butts*, 760 F.3d 631, 635 (7th Cir. 2014) (quoting *Strickland v. Washington*, 466 U.S. 668, 684 (1984)). "It entitles a defendant to the effective assistance of counsel . . . at trial." *Id.* (citing *Evitts v. Lucey*, 469 U.S. 387, 396 (1985)).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components." *Id*. at 687. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*.

"Second, the defendant must show that the deficient performance prejudiced the defense." *Id*. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial . . . ." *Id*. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Instead, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

"A defendant's failure to establish either prong of the test is fatal to his ineffective assistance of counsel claim," *Butts*, 760 F.3d at 635 (citing *Rastafari v. Anderson*, 278 F.3d 673, 688 (7th Cir. 2002)), and "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one," *Strickland*, 466 U.S. at 697.

Moreover, "[w]hen an ineffective-assistance-of-counsel claim is presented in a federal habeas petition, a state prisoner faces additional burdens." *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020). While the "*Strickland* standard is 'highly demanding'" in the first place, in the habeas context it is even more so, because "the prisoner must show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Id*. at 523, 526 (first quoting *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986) then quoting *Harrington*, 562 U.S. at 103). "Moreover, we have recognized that the more general the rule, the more leeway state courts have." *Id*. (citation and quotation marks omitted). "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 556 U.S. at 12 (citing *Yarborough*, 541 U.S. at 664).

First, although Petitioner argues in his brief in support that Attorney Murphy allowed prior bad acts evidence to be introduced "without speaking up" and that he "failed to object," this is not an accurate characterization of what happened, which Petitioner appears to later acknowledge in his reply. ECF No. 20 at 4; ECF No. 23 at 1. As recounted *supra* Section 4.1.1, Attorney Murphy *did* object to the State's intent to use

statements in the PSI to impeach Petitioner. He was, in fact, at first successful; the trial court initially disallowed use of the statements in the PSI to impeach Petitioner. It appears that it was only after Petitioner continued to make what the court interpreted as inconsistent statements that the court changed course and allowed limited impeachment by use of the PSI, notwithstanding Attorney Murphy's continued disagreement expressed during a sidebar. ECF No. 10-11 at 127; ECF No. 10-14 at 29–32.

Petitioner complains that Attorney Murphy "did not file any paperwork to reject on limiting prior bad acts admission by the [S]tate," ECF No. 20 at 4, perhaps suggesting that Attorney Murphy ought to have preemptively sought to preclude the admission of the statements from the PSI through a motion in limine. But Attorney Murphy informed the trial court that he was not aware of the existence of the PSI, had not been provided with it, and that Petitioner never informed him of it. ECF No. 10-11 at 88. It is therefore unclear how Attorney Murphy would have had the wherewithal to think to preemptively prevent its admission. Besides, "the decision regarding whether to file [a motion in limine] is clearly part of the process of establishing trial strategy," and "there is a strong presumption that strategy decisions are sound . . . ." *United States v. Mutuc*, 349 F.3d 930, 935 (7th Cir. 2003) (quoting *Jones v. Stotts*, 59 F.3d 143, 146 (10th Cir. 1995) and citing *Strickland*, 466 U.S. at 690). Petitioner has not overcome that presumption.

In any event, the Court cannot conclude that the Wisconsin Court of Appeals' determination that Petitioner had not shown that "the result of the trial would have been different absent the use of his PSI statements" was "so obviously wrong that its [decision] lies 'beyond any possibility for fairminded disagreement.'" ECF No. 10-6 at 15; *Shinn*, 141 S. Ct. at 526. The

Court has reviewed the entirety of the trial transcript, and, as Respondent argues, ECF No. 21 at 17, there was a great deal of evidence pointing to Petitioner's participation in the credit union robbery such that the impeachment of Petitioner via the PSI statements appears to have been relatively inconsequential.

The evidence against Petitioner is summarized as follows. A witness testified that Frost confessed to him that both he and Petitioner committed the Cinema robbery and the credit union robbery and that they did so "in the same manner: by holding the employees at gunpoint, zip tying them, and leaving with the money." ECF No. 10-6 at 3; ECF No. 10-10 at 172–73, 175–77. Another witness, albeit one who had agreed to provide information in exchange for a sentence recommendation from the State in a different case, testified to the same—that Frost told him that he committed both the Cinema robbery and the credit union robbery with "the same guy." ECF No. 10-10 at 196, 201, 229. Yet another witness, "one of [Petitioner's] fellow jail inmates," testified that Petitioner "had admitted to participating in a 'bank' robbery and included details of the crime that the State alleged were only known by law enforcement and the perpetrators," although he later told police "that everything [he] told them was a dream." ECF No. 10-6 at 3; ECF No. 10-10 at 258–66 (Q: "[D]o you remember [Petitioner] telling you that he went into a bank, he hit it, and they came out with over $4,000? Do you remember him telling you that that happened?" A: "Yes."); *id*. at 272–73, 287–88.[4]

_____

[4]This jail inmate witness had also approached law enforcement to provide information to attempt to broker a deal "so [he] could be released from custody," but the "deal never materialized," ECF No. 10-10 at 269–70, so he received no benefit for his testimony. *See id.* at 273. The testimony of a police officer suggests

Case 2:23-cv-00836-JPS   Filed 05/17/24   Page 16 of 33   Document 24

Another witness—Petitioner' long-time girlfriend—gave testimony suggesting that Petitioner may have coached her on what to say at trial. ECF No. 10-10 at 115 (Q: "Do you remember [Petitioner] telling you to come up here and just testify that you don't know what happened?" A: "Um, he told me that if I don't remember, I don't remember." Q: "Did he ever tell you just say you don't know?" A: "If I don't know, then I'm supposed to say I don't know."). And notwithstanding Petitioner's own attempts to downplay his relationship with Frost, ECF No. 10-11 at 40, Petitioner's girlfriend testified that Frost and Petitioner were "friends," "were tight before the prison sentence," and "talked a lot." ECF No. 10-10 at 116, 123. She testified that Frost frequently visited Petitioner at their residence and that, to the best of her memory, Petitioner and Frost had seen each other "on the week leading up to th[e] robbery at the credit union." *Id.* at 123.

Petitioner himself testified and conceded to his participation in the Cinema case, which shared similarities with the credit union robbery, to which Frost had already confessed. ECF No. 10-6 at 4; ECF No. 10-11 at 47. It was established at trial that the credit union robber believed to be Petitioner wore a black mask, dark clothing, and carried a black gun, just like in the Cinema robbery. ECF No. 10-9 at 278; ECF No. 10-10 at 31, 86. It was also established that the credit union robbery involved the use of zip ties, just like in the Cinema robbery, ECF No. 10-9 at 203; ECF No. 10-10 at 30, 300, and that zip ties consistent with those from both the credit union robbery and the Cinema robbery were found in Petitioner's residence. ECF No. 10-11 at 14–15. A police officer testified that the use of zip ties in

---

that the witness's assertion that he had dreamed the whole thing up was attributable to the deal not materializing. *Id.* at 286.

robberies in Outagamie County was not common from what he had seen in his twenty-three-year-long career. ECF No. 10-10 at 283.

Moreover, the robberies both occurred in the Appleton area, just five months apart. ECF No. 10-9 at 173; ECF No. 10-10 at 303. The credit union robbery occurred just "a couple hundred yards away" from Petitioner's residence, ECF No. 10-10 at 121, and a sheriff's deputy testified that his trained police dog tracked a scent from the scene of the robbery to a location "just ten to 11 houses away from" that residence. ECF No. 10-11 at 11, 26; ECF No. 10-10 at 135–40; *see also* ECF No. 10-10 at 260 (jail inmate testimony) (Q: "Do you remember [Petitioner] telling you that he was upset because that bank was so close to his house but [Frost] still wanted to hit it?" A: "I don't remember it; but it did say that in my statement, that."); ECF No. 10-10 at 289–90. According to the State, the path tracked by the police dog was consistent with testimony from the jail inmate witness to whom Petitioner allegedly confessed. ECF No. 10-10 at 280 ("Q: "Were you aware that your statement about what they did after the bank robbery was 100 percent consistent with what the trained canine actually followed?" A: "No, I didn't know that.").

To the extent the State's impeachment by use of the PSI damaged Petitioner's credibility, he had—and, in fact, took advantage of—the opportunity to clarify the perceived inconsistencies in his testimony. And the impeachment was, in any event, not particularly damning, establishing little more than the facts that Petitioner had sold some drugs as a teenager and that he had been the victim of a shooting. It was entirely reasonable, therefore, for the Wisconsin Court of Appeals to conclude that there was no "reasonable probability that, but for [the impeachment of Petitioner by use of the PSI], the result of the proceeding would have been different."

Case 2:23-cv-00836-JPS   Filed 05/17/24   Page 18 of 33   Document 24

*Strickland,* 466 U.S. at 694. In light of all the foregoing, the Court cannot conclude that the Wisconsin Court of Appeals' rejection of Petitioner's ineffective assistance of counsel claim was "so obviously wrong that it[] . . . lies 'beyond any possibility for fairminded disagreement.'" *Shinn,* 141 S. Ct. at 526. Accordingly, the Court will deny this ground for relief.

### 4.2    Ground Five

In Ground Five, Petitioner asserts that the trial court improperly interfered with the testimony of two defense witnesses by providing perjury warnings to them but not to any State's witnesses in violation of his Due Process right to a fair trial. ECF No. 20 at 7; *id.* at 8 ("[O]nly the witnesses who testified in my favor got interrupted and warned by the court[].")." Petitioner argues that the court inappropriately assumed that these witnesses would be biased in favor of Petitioner and that the court's interference and perjury warnings "swayed" those witnesses and "intimidate[d] [them] into testifying in favor of the [S]tate." *Id.* at 7, 9.

Respondent argues that the Wisconsin Court of Appeals' rejection of this claim correctly identified and applied governing Supreme Court precedent and therefore does not warrant habeas relief. ECF No. 21 at 22–23.

For the reasons discussed herein, the Court will deny this ground.

### 4.2.1    Facts Relevant to Ground Five

Three total witnesses were given perjury warnings during trial.[5] The first was Frost, who was called by the State to testify against Petitioner. ECF No. 10-10 at 66–67 ("You are subject to the rules of perjury. So if you were

---

[5]Petitioner asserts that "[o]nly two witnesses were warned . . . ." and that "the 21 witnesses for the [S]tate had no such interruptions," ECF No. 23 at 4, but this is not accurate, as recounted *infra* Section 4.2.1.

to say something today while under oath that is an intentional misrepresentation or is false, you could be charged with perjury."). However, the warning in that instance was provided to Frost outside of the presence of the jury and in the context of explaining to Frost the Fifth Amendment privilege. *Id.*

The second witness to whom a perjury warning was provided by the court was Petitioner's long-time girlfriend, who was also called by the State. *Id.* at 111.

| | |
|---|---|
| Q: | Did John Frost tell you he's not going to testify? |
| A: | I don't remember. |
| Q: | You don't remember? |
| A: | (Shaking head.) |
| Q: | Did he talk about the trial with you? |
| A: | He talked about his part of the trial. |
| Court: | I just want to jump in here on a couple things. |
| . . . | |
| Court: | Again, I don't know if you know this or not. I haven't been told of anything about this. No. 1, all of those telephone conversations are recorded. |
| A: | That's fine. |
| Court: | I don't know if you know that, but I expect the way [the State] is asking these questions that there's going to be a transcript pulled out momentarily because that's what he does. |
| A: | Yeah. |
| Court: | The second part of it is you just took an oath. You are subject to the rules of perjury. |
| A: | Yes. |
| Court: | If you answer questions falsely while you are under oath, you may be charged with a felony |

|       |                                                                                                 |
|-------|-------------------------------------------------------------------------------------------------|
|       | crime of perjury; and that's punishable by up to six years in prison for each of those offenses. |
| A:    | Okay.                                                                                           |
| Court: | The reason I interrupted is I'm not interested in getting you involved or getting you in trouble. I wanted to make sure you understood those rights and probably what is likely to come from the State on those telephone conversations. |

*Id.* at 112–14.

Lastly, the jail inmate witness was provided a perjury warning after having been called to testify by the State. *Id.* at 248–49. He was at first warned outside of the presence of the jury. *Id.* As with Frost, the court provided this initial warning in the context of also explaining the Fifth Amendment privilege. *Id.* at 249. The witness was again warned later, this time in the presence of the jury. *Id*. at 255.

|    |                                                                                                                                            |
|----|--------------------------------------------------------------------------------------------------------------------------------------------|
| Q: | You heard statements from [Petitioner] immediately after he was charged with this case; is that correct?                                    |
| A: | I mean we had conversations, yes.                                                                                                          |
| Q: | And he made statements to you admitting that he was involved in these offenses; is that true?                                               |
| A: | That—That's what he was charged with.                                                                                                     |
| Q: | So your testimony today—You are under oath. You know that, right?                                                                           |
| A: | Yes.                                                                                                                                       |
| Q: | Your testimony today is that [Petitioner] never made any statements to you related to his involvement in a bank robbery at Fox Communities Credit Union; is that true? |
| A: | I—What do you mean by that? I mean, like, he talked about what he was charged with, yes.                                                    |

| Q: | Judge, I am going to ask permission to give a little more leeway in asking questions. |
|---|---|
| Court: | You have leeway. One thing that I want—You and I went through this. I am just going to remind you so someday if somebody is reading this transcript there's no issues with what you understand, okay? |

. . .

| Court: | Understand? |
|---|---|
| A: | Yes. |
| Court: | You are under oath. You are subject to the rules of perjury, which requires [sic] that if you are going to testify you need to testify honestly, true statements. Correct? I want you—I want to make sure you understand that. |
| A: | Yeah. No, I understand. |
| Court: | So far I am hearing you ask [the State] what he means. His questions are pretty clear. So I don't want to get into playing games. I don't want to do other things that I told you will happen, understood? Contempt of court, other things. |
| A: | Yes. |
| Court: | Okay. |

. . .

| Court: | If you decide to answer [the questions], you need to do it honestly or there's going to be some ramifications. |
|---|---|

*Id.* at 255–57.

### 4.2.2   Court of Appeals' Disposition

The Wisconsin Court of Appeals noted that "it is entirely proper for a trial judge to warn a potential witness of possible sanctions if the judge perceives that the witness may intend to perjure himself." ECF No. 10-6 at 7 (quoting *United States v. Cavale*, 688 F.2d 1098, 1109 (7th Cir. 1982) and

citing *United States v. Arthur*, 949 F.2d 211, 215–16 (6th Cir. 1991)). "A judge's admonition to a witness can violate *Webb* [*v. Texas*, 409 U.S. 95 (1972)], however, 'if it is threatening and employs coercive language indicating the court's expectation of perjury.'" *Id.* (quoting *United States v. Smith*, 997 F.2d 674, 680 (10th Cir. 1993) (internal quotation marks omitted)).

The Wisconsin Court of Appeals concluded that "the circuit court properly exercised its discretion by warning [the jail inmate witness and Petitioner's girlfriend] about the possibility of incriminating themselves." *Id.* at 7–8. The court noted that the jail inmate witness was only given a perjury warning in front of the jury when he "began providing evasive answers." *Id*. at 8. The court concluded that the "admonitions to [those witnesses] were not threatening, intimidating, or coercive and did not interfere with either witness's decision to testify," and that they were only given "in response to the witnesses feigning memory loss and providing evasive answers." *Id.* at 9.

### 4.2.3   Analysis

"In criminal proceedings, only '[u]necessarily strong admonitions against perjury aimed at discouraging defense witnesses from testifying have been held to deprive a criminal defendant of his [constitutional rights].'" *United States v. Hernandez-Escobar*, 911 F.3d 952, 959 (9th Cir. 2018) (quoting *United States v. Juan*, 704 F.3d 1137, 1141 (9th Cir. 2013)).

In *Webb*, the Supreme Court held that a defendant's Fourteenth Amendment Due Process rights were violated when "[t]he trial judge gratuitously singled out this one [defense] witness for a lengthy admonition on the dangers of perjury," "implied that he expected [the witness] to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would

be added on to his present sentence, and that the result would be to impair his chances for parole." 409 U.S. at 97–98. "[T]he unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." *Id.* at 98.

The circumstances of this case are sufficiently distinct from those in *Webb* that the Court cannot conclude that the Wisconsin Court of Appeals ran afoul of or unreasonably applied governing Supreme Court precedent when it rejected Ground Five. The trial court in this case did not gratuitously single out only defense witnesses—it provided perjury warnings to three witnesses, all of whom had been called to testify by the State. The court in this case did not threaten that any of the witnesses "would" necessarily be prosecuted for perjury, *id.* at 97; it merely conveyed that they *could* be if they chose to lie on the stand. No "unnecessarily strong terms" or aggressive language appears to have been used; to the contrary, the judge told Petitioner's girlfriend that he was "not interested in getting [her] involved or getting [her] in trouble," but that he wanted to ensure that she "understood those rights" and understood that she was likely going to be impeached by the State if she lied. ECF No. 10-10 at 112–13. With respect to the jail inmate witness, the court stated that it wanted to make sure that the witness understood the warning he had previously been provided and that it did not want to reach a point of having to consider imposing any sanction on the witness. *Id.* at 255–56. Neither of these admonitions could be deemed particularly "lengthy," nor did they "effectively dr[i]ve th[e] witness[es] off the stand." *Webb*, 409 U.S. at 97–98. For these reasons, the Court concludes that the Wisconsin Court of Appeals' rejection of this ground for relief did not run contrary to or unreasonably apply clearly

Case 2:23-cv-00836-JPS   Filed 05/17/24   Page 24 of 33   Document 24

established Supreme Court precedent. The Court will accordingly deny Ground Five.

### 4.3 Ground Six

Lastly, in Ground Six, Petitioner asserts that the trial court was impermissibly biased against him. He argues that the court demonstrated bias by interfering with witnesses' testimony (referencing that encompassed within Ground Five), by "spen[ding] a considerable amount of time introducing the State[']s final, rebuttal witness," and vouching for "the [witness's] . . . quality of work . . . and his personal credibility." ECF No. 20 at 11–12.

Respondent argues that the Wisconsin Court of Appeals' rejection of this ground "was not contrary to federal law as determined by the Supreme Court" and was, in fact, "a reasonable application of that law." ECF No. 21 at 25–26. The Court agrees, and so it will deny Ground Six.

#### 4.3.1 Facts Relevant to Ground Six

During cross-examination, Petitioner testified that he asked the court commissioner at his initial appearance to read his criminal complaint because Petitioner purported to have "no clue why [he] was back in court." ECF No. 10-11 at 65. To this the State said, "you are aware that he didn't do that, right? The court commissioner does not read the facts of the probable cause portion of the criminal complaint, right?" *Id.* Petitioner continued to insist that the court commissioner "read the entire criminal complaint front to back" during his initial appearance. *Id.* Petitioner's theory was that a witness in the trial against him knew details about the case solely from having heard the court commissioner read the entirety of the criminal complaint out loud at Petitioner's initial appearance.

Case 2:23-cv-00836-JPS   Filed 05/17/24   Page 25 of 33   Document 24

At this point, the State moved the court to take "judicial notice that that is not a common practice and that does not occur." *Id.* Attorney Murphy objected, asserting that that was not something of which the court could take judicial notice. *Id.* at 65–66.

The court accordingly decided to mark as an exhibit a copy the minutes from Petitioner's initial appearance. *Id.* at 66. The court noted that the minutes somehow indicated both that the "[c]ourt read[] [the] complaint" and that "Defendant waive[d] reading of complaint." *Id.* at 66–67 ("[T]hat's what the minutes reflect. I will take judicial notice of the minutes.").

Following the conclusion of Petitioner's testimony, the State expressed its intent to call Court Commissioner Brian Figy ("Figy") as a rebuttal witness, to rebut Petitioner's testimony that Figy read the entirety of the criminal complaint out loud at the initial appearance. *Id.* at 130–31; *id.* at 121.

Outside of the presence of the jury, the court noted that it was "not going to decide the credibility of . . . Figy." *Id.* at 122–23 ("The jurors will do that, and I would treat him just like any other witness."). The court also stated that it planned to "take judicial notice, if everybody's okay with that, of a couple facts and just tell them what a court commissioner is, the setup of this, work that . . . Figy does." *Id.* at 131. Attorney Murphy did not object to that proposition.[6]

The jury returned to the courtroom and trial proceeded as follows:

_____

[6]It is presumably for that reason that the State argued on appeal that Petitioner "ha[d] forfeited this argument." ECF No. 10-6 at 10 n.5. The Court of Appeals nevertheless "ch[ose] to reach the merits" of the claim. *Id.* (citing *State v. Erickson*, 596 N.W.2d 749, 754 (Wis. 1999)).

| Court: | So the next witness in this case is going to be the State's rebuttal witness and it's Commissioner . . . Figy. Commissioner Figy is sitting there. He's going to come up and testify . . . . |
|---|---|

First off, . . . Figy has been a court commissioner for a lot of years. I know it's got to be close to 20. I am sure he will tell you that. We have four court commissioners in Outagamie County. A court commissioner is a judicial officer. They are not elected like judges are, but they are hired and they do court commissioner work, which includes putting on a black robe and sitting on a bench and handling cases just like we do.

Commissioner Figy is the primary court commissioner, and what that means is he kind of does everything and in my opinion is sort of the lead person down there. We have a family court commissioner and that family court commissioner would handle divorce-type cases and family-law cases. We have an assistant family court commissioner, who is a part-time person who does family-law cases; and then we have a fourth court commissioner who does a lot of small claims work.

And then, of course, they fill in for each other. So all of them can kind of do all of that. In Outagamie County . . . there's between 25,000 and 30,000 cases a year. So if you divide that by seven judges, that's a lot of cases; and so the court commissioners do a lot of work that we don't have to do and so they—They are busy. I tell . . . Figy all of the time I give him credit because he handles hundreds and hundreds of cases every day where I get to focus on one case today and handle this trial. He's downstairs doing hundreds of cases, and he will do it again tomorrow. It's just kind of a busy docket.

> That's sort of the reality of what court commissioners do. I know [the State] wanted me to take judicial notice of what . . . Figy did or didn't do on a particular case. He is here to provide testimony on what he did.

*Id.* at 132–34. Neither party objected to any portion of this statement. *Id.* at 134; *see supra* note 6. The Court then additionally noted that the jury "should assess his credibility, which is his believability, the same way that [it] assess[es] the credibility or believability of any other witness." *Id.* at 136. Figy then testified that he oversaw Petitioner's initial appearance and that his practice has been to "read the charging counts contained within the criminal complaint," but not "the body of the criminal complaint where it summarizes the allegations." *Id.* at 140–41 ("I do not recall ever in my 18 or so years . . . reading the actual body of the criminal complaint . . . .").

### 4.3.2   Court of Appeals' Disposition

The Wisconsin Court of Appeals wrote that "[t]here are two tests to evaluate whether a defendant has rebutted the presumption [that judges are not biased]: subjective and objective," and that "[Petitioner] argue[d] only objective bias." ECF No. 10-6 at 10 (citing *State v. Goodson*, 771 N.W.2d 385, ¶ 8 (Wis. Ct. App. 2009)). It then noted that "[o]bjective bias can exist in two situations[:]" first, "where there is the appearance of bias," and second, "where there are objective facts demonstrating . . . the trial judge in fact treated [the defendant] unfairly." *Id*. at 10–11 (quoting *Goodson*, 771 N.W.2d, ¶ 8 (internal quotation marks omitted)). "According to [Petitioner]," the court recounted, "the record reflects the circuit court was objectively biased because it"

> (1) interfered with the testimony of [Petitioner's girlfriend] and [the jail inmate witness] by threatening them with perjury

and contempt of court if they continued to testify falsely, (2) investigated evidence from the initial appearance to contradict [Petitioner's] testimony, and (3) vouched for [Figy's] credibility.

*Id.* at 11. The court concluded that none of these arguments demonstrated objective bias on the part of the trial court. *Id.* First, it noted that the provision of perjury warnings was appropriate and proper. *Id.* (citing *Cavale*, 788 F.2d at 1109). Second, it concluded that the court did not demonstrate bias when it "obtain[ed] the clerk's minutes from [Petitioner's] initial appearance" because it did so "as a neutral response to the State's request" "to take judicial notice of whether court commissioners routinely read criminal complaints at initial appearances." *Id.* at 11–12. Lastly, the court concluded that the trial court's statements about Figy were not improper and that Petitioner had failed to "provide any legal support for his position." *Id.* at 13.

### 4.3.3   Analysis

"The Due Process Clause guarantees litigants an impartial judge, reflecting the principle that 'no [one] is permitted to try cases where he has an interest in the outcome.'" *Franklin v. McCaughtry*, 398 F.3d 955, 959 (7th Cir. 2005) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).[7] "The general

---

[7] It is true that circuit, rather than Supreme Court, precedent does not in and of itself constitute "clearly established" federal law for purposes of habeas review, but it nevertheless may help guide the inquiry. *See Lewis v. Zatecky*, 993 F.3d 994, 1000 (7th Cir. 2021) ("For purposes of section 2254(d), the only relevant law is that which is 'clearly established Federal law, as determined by the Supreme Court of the United States[.]' . . . . Our own decisions, as well as those of other circuits or state courts, are informative only insofar as they may shed light on our understanding of the authoritative Supreme Court precedents.").

presumption is that judges are honest, upright individuals and thus that they rise above biasing influences." *Id.* (collecting cases).

"To prove disqualifying bias, a petitioner must offer either direct evidence or 'a possible temptation so severe that we might presume an actual, substantial incentive to be biased.'" *Id.* at 960 (quoting *Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1375 (7th Cir. 1994) (en banc)). "[D]ue process is violated when a judge presides in a case that 'would offer a possible temptation to the average man . . . to forget the burden of proof required to convict the defendant' or would 'lead him not to hold the balance nice, clear, and true between the state and the accused.'" *Harrison v. McBride*, 428 F.3d 652, 668 (7th Cir. 2005) (quoting *Tumey v. State of Ohio*, 273 U.S. 510, 532 (1927)).

The Court sets aside Petitioner's argument that the trial court demonstrated bias against him by giving perjury warnings to several witnesses; as discussed *supra* Section 4.2.3, the Court has already concluded that such provision of perjury warnings did not run afoul of governing federal precedent. In any event, these warnings did not demonstrate bias on the part of the trial court because they were given either in the context of explaining a witness's rights or in response to what the court perceived as improper or evasive testimony. The Court therefore cabins its analysis of this ground to Petitioner's assertion that the court improperly took judicial notice of minutes from his initial appearance and vouched for Figy's credibility.

The Court concludes that the Wisconsin Court of Appeals' rejection of Ground Six was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. With respect to the trial court's taking judicial notice of the

minutes from Petitioner's initial appearance, the Court agrees with the Wisconsin Court of Appeals that no bias in favor of the State was demonstrated thereby. The trial court took judicial notice of the minutes as a neutral response to the State's request that the court take judicial notice of the court commissioner's standard procedure itself. The trial court, in other words, declined to do what the State asked of it. And as the Wisconsin Court of Appeals noted, "[t]he minutes showed support for both [Petitioner's] and the State's positions, as the boxes indicating that the complaint was read and that the reading was waived were both checked." ECF No. 10-6 at 12. The Court's having taken judicial notice of the minutes, therefore, was not favorable to either side and did not demonstrate bias in either direction.[8]

Neither did the trial court's comments introducing Figy rise to the level of a Due Process violation. Most of the court's statement served only to provide neutral background information about the court commissioner position, generally. While it is true that the court also spoke to Figy's long tenure and his adept handling of a large workload—matters that could reflect positively on his credibility—the court remedied any potential appearance of bias by reminding the jurors that it was ultimately their responsibility to evaluate Figy's credibility as they deemed appropriate. That directive was repeated the following day when the court recited the jury instructions. ECF No. 10-12 at 26–27 ("You, the jurors, are the judges of the credibility of the witnesses . . . ."). Therefore, even if there had been any

---

[8] In any event, and further supporting this conclusion, is the fact that "judicial rulings alone almost never constitute a valid basis for a bias or partiality . . . motion." *Liteky v. United States,* 510 U.S. 540, 555 (1994) (citing *United States v. Grinnell Corp.,* 384 U.S. 563, 583 (1966)).

bias on the part of the court in favor of Figy, it was cured by the provision of the credibility instructions. *See United States v. Bahena*, 71 F.4th 632, 637 (7th Cir. 2023) (citing *United States v. Gan*, 54 F.4th 467, 477 (7th Cir. 2022)). For all these reasons, the Court will deny Ground Six.

## 5.   CONCLUSION

As discussed above, all three of Petitioner's grounds for relief will be denied on their merits. Accordingly, the Court is constrained to deny the amended petition and dismiss this action with prejudice.

Under Rule 11(a) of the Rules Governing Section 2254 Cases, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability under 28 U.S.C. § 2253(c)(2), a petitioner must make a "substantial showing of the denial of a constitutional right" by establishing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). No reasonable jurists could debate whether the amended petition has merit. The Court must, therefore, deny Petitioner a certificate of appealability.

Accordingly,

**IT IS ORDERED** that Petitioner's amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, ECF No. 5, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that a certificate of appealability be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 17th day of May, 2024.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge

---

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.